1 | Michael S. Edmiston (CASBN 191874)
E-mail: msedmiston@stocklaw.com
2 | Jonathan W. Evans & Associates
12711 Ventura Boulevard – Suite 440
3 | Studio City, California 91604-2456
Telephone: (818) 760-9880
4 | Facsimile: (818) 760-9881
www.stocklaw.com
5 |
*Attorneys for Plaintiff Daniel McNally, individually and on behalf of all others*
6 | *similarly situated*
7 | [Additional counsel on signature page.]

8 | **UNITED STATES DISTRICT COURT**

9 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10 |

11 | DANIEL MCNALLY, individually and on behalf of all others similarly situated,

12 |

13 |                                  Plaintiff,

14 |        vs.

15 | THE KINGDOM TRUST COMPANY, a South Dakota corporation,

16 |

17 |                                  Defendant.

**Case No.:**

**CLASS ACTION COMPLAINT FOR:**
Violations of California Corporations Code § 25504.1; Aiding and Abetting Fraud; Aiding and Abetting Breach of Fiduciary Duty; Civil Conspiracy; Negligence; Breach of Fiduciary Duty; Fraud; Negligent Misrepresentations and Omissions.

**CLASS ACTION**
**JURY TRIAL DEMANDED**

Plaintiff, Daniel McNally ("Plaintiff" or "McNally"), by his undersigned attorneys, hereby brings this class action Complaint (the "Complaint") against Kingdom Trust Company ("Kingdom Trust" or "Defendant"). The allegations herein are based on Plaintiff's personal knowledge as to his own acts, respectively, and on information and belief as to all other matters, except for the allegations sounding in fraud, such information and belief having been informed by the investigation conducted by and under the supervision of Plaintiff's counsel, which includes, without limitation, review and analysis of: (a) the proceedings

brought by the Securities and Exchange Commission (the "SEC" or "Commission") against William Jordan starting on or about May 15, 2018 in the case of *SEC v. Jordan*, No. 8:18-cv-00852 (C.D. Cal. May. 15, 2018) (the "SEC Action"); and (b) review of various other public records associated with the WJA Funds and its control person. Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendant. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of himself and the class he seeks to represent, Plaintiff alleges as follows.

## I.   NATURE OF THE ACTION

1.   Plaintiff and other members of the class are victims of a Ponzi scheme knowingly assisted by Kingdom Trust, acting (1) as a trustee, (2) as a custodian, and (3) as a *de facto* bank for the Jordan Scheme. By its substantial assistance, including the actions of Kingdom Trust and its employees in furtherance of and to facilitate the scheme, and through its actual knowledge that fiduciary funds it held and undertook to safeguard and segregate as trustee and custodian were being commingled, diverted, and used for Ponzi payments, Kingdom Trust aided and abetted the scheme. Moreover, Kingdom Trust was negligent in failing to act, as it was required to do once it became aware that investor money, *i.e.*, fiduciary funds for which it acted as trustee and custodian, and which it undertook a duty to safeguard and segregate, were being improperly commingled and diverted.

2.   The scheme was perpetrated by William Jordan ("Jordan"), who, acting as an advisor and fiduciary for investors, placed their money in several investment funds he organized and controlled (the "WJA Funds" or the "Funds"), ostensibly to profitably invest such money in real estate, private equity, and other securities.

3.    The WJA Funds were structured, as well as marketed and promoted to prospective investors, as independent and separate entities designed to pool investor money, to be discretionarily managed by Jordan.

4.    Each of the WJA Funds was supposed to have its own custodial/trust account, and money deposited by investors in each respective WJA Fund was supposed to be kept segregated from the other WJA Funds, safeguarded, and invested in accordance with that respective Fund's purpose and investment objectives, in assets or holdings purchased or owned by that Fund.

5.    Many of the WJA investors were retirees who invested their retirement savings in the WJA Funds through IRA and/or 401k accounts.

6.    To convince investors to entrust him with their money and assuage any concerns of potential misconduct, Jordan assured his investors that investor money in each WJA Fund was separately held in custody by a third-party custodian, and that the investors' investment proceeds in each WJA Fund would be used according to that respective Fund's "use of proceeds" provisions.

7.    To that extent, Jordan opened ostensibly *separate accounts* for the WJA Funds with Defendant.

8.    Defendant undertook a duty to segregate and safeguard each WJA Fund's money deposited by investors in that respective WJA Fund.

9.    In reality, the WJA Funds were part of a fraud ("the Jordan Scheme"), and the investor money deposited in the WJA Funds – and held by Defendant as the WJA Funds' trustee/custodian – was commingled, misappropriated, and used as Jordan's personal piggybank.

10.    As stated in the SEC Action, Jordan improperly treated the separate, standalone WJA Funds as one pool of money, commingled money deposited by investors in the various, ostensibly separate WJA Funds, improperly overpaid himself and his entities, and regularly – and unlawfully – moved money among

the WJA Funds to meet his cash flow needs, including for Ponzi-like payments to existing investors. *See* SEC Complaint, attached hereto as Exhibit "A."

11.     Jordan improperly used investor money to prop up his failing Funds and make payments to earlier investors to create and maintain the appearance of a successful business enterprise, when, in reality, the WJA Funds were not real investment funds but a Ponzi scheme.

12.     Jordan could not have perpetrated the WJA Fund fraud on his own. Instead, he crucially depended on the knowing participation of the WJA Funds' trustee/custodian and *de facto* bank, Defendant Kingdom Trust, through whose accounts Jordan committed his misconduct, and who knowingly and substantially assisted Jordan's misconduct.

13.     As explained in more detail herein, the epicenter of Jordan's WJA Fund scheme was one account at Kingdom Trust (the "Kingdom Trust Account"), in which money from all WJA Funds was improperly commingled and, from which it was improperly disbursed to prop up Jordan's failing businesses and to pay earlier investors in Ponzi scheme fashion.

14.     As explained in more detail herein, Plaintiff's counsel's investigation shows that Kingdom Trust had *actual knowledge* that: (1) the WJA Funds were independent, stand-alone investment funds that were supposed to invest investor money according to their respective purpose and investment objectives; (2) each of the WJA Funds was controlled by Jordan and his fund management business; (3) each of the WJA Funds was supposed to have its own separate and segregated account to hold money from that fund's investors; (4) each of the WJA Funds received investment proceeds from investors in that Fund, ostensibly to be invested according to the respective Fund's purpose; (5) Jordan and his *alter-ego* fund management business were managing investor money as fiduciaries, and thus the WJA Funds held fiduciary money; (6) Jordan was misusing funds from the WJA Funds by improperly commingling such funds, in violation of the duty

to segregate them, and transferring them to Jordan's other Funds instead of investing them as represented to investors; and (7) Jordan and his *alter-ego* fund management business were misusing investor money to make Ponzi payments.

15.    Armed with such knowledge, Defendant substantially assisted the Jordan Scheme by engaging in highly atypical activities that greatly departed from the typical services offered by a trustee/custodian and bank – and violated the very agreements between Defendant and the WJA Funds designed to safeguard and segregate the investors' money.

16.    Specifically, Defendant executed transactions for the Jordan Scheme that improperly commingled known fiduciary funds across various WJA Funds that had different purposes and investment objectives; improperly disbursed investor money to Jordan; and made Ponzi payments to existing WJA Fund investor with new investor money deposited in other WJA Funds.

17.    Most egregiously, Defendant breached its own agreement with the WJA Funds, which required that the investors' money in each WJA Fund be kept segregated from investor money in other WJA Funds, and kept all such money in a single account.

18.    Defendant undertook the duties, owed to WJA Fund investors, to safeguard and segregate investor money, but breached those duties by failing to either safeguard or segregate that money.

19.    The improper commingling of investor funds in the Kingdom Trust accounts enabled Jordan to treat all investor money as a single pool and to misuse that money for his own benefit, as well as use it for Ponzi payments to earlier investors, which in turn enabled him to prolong his Scheme and victimize more investors.

20.    Defendant's substantial and knowing assistance of the Jordan Scheme proximately caused Plaintiff's and the other investors' losses.

21.     On May 15, 2018, Jordan's Scheme began to unwind. On that date, the SEC filed a civil enforcement action against Jordan. The SEC Complaint alleged that Jordan made material misrepresentations and omissions to solicit investors in California and across the country to invest in his scheme. The SEC also charged Jordan with fraud and asserted violations of the federal securities laws. *See* Exhibit "A."

22.     Plaintiff and the other members of the class were victims of Jordan's investment Scheme perpetrated through Kingdom Trust's accounts. Class members invested their retirement savings in what they believed to be stand-alone investment funds, and were damaged thereby.

23.     Plaintiff brings this action on his own behalf and on behalf of a class of all persons similarly situated to recover damages from Defendant that were directly caused by Defendant's own independent wrongdoing and knowing assistance in the Jordan Scheme.

## II.     JURISDICTION AND VENUE

24.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d), as the aggregate amount in controversy exceeds $5,000,000, at least one class member is a citizen of a State different from a defendant, and more than one third of all Class members may reside outside of the state of California.

25.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged below occurred in this District, the Jordan Scheme was based in this District, a substantial volume of evidence as well as key witnesses are in this District, and because Defendant directed its business activities into this District and assisted a fraud in this District. Venue is also proper because Defendant transacts and has transacted business in this District at times material to this action.

## III.     PARTIES

**A.     Plaintiff**

26.     Plaintiff Daniel McNally is a natural person residing in Orange, California. Mr. McNally made several investments in the WJA Funds, for a total of $450,000 between 2015 and2016. Mr. McNally's investment proceeds were transferred to the WJA Funds' Kingdom Trust accounts. Mr. McNally learned that the loss of his investments might have been a result of illegal conduct after the SEC Complaint's allegations that Jordan and its principals committed fraud.

**B.     Defendant**

27.     Defendant Kingdom Trust is a South Dakota corporation formed on or about 2010, with its principal place of business located in Sioux Falls, South Dakota.

28.     Kingdom Trust is a financial institution, custodian bank, and public trust company that specializes in alternative investment custody for clients, which clients include alternative asset investment funds and their advisors. Defendant is an independent qualified custodian and trustee under the Investment Advisers Act of 1940, as amended, and 26 U.S.C. § 408. Defendant is regulated by the SEC and the South Dakota Division of Banking.

29.     Defendant was, and acted as, a trustee and fiduciary of the WJA Funds' custodial/trust accounts.

30.     At all relevant times, Defendant conducted extensive business in this District, and provided custodial and banking services to the Jordan Scheme, which was located in this District and perpetrated in and from this District. Defendant further provided substantial assistance to the Jordan Scheme's perpetration of its fraud and breach of fiduciary duties, in and from this District.

31.     On its website, Defendant advised the public that "[u]sing an independent qualified custodian like Kingdom Trust for institutional custody services:

- saves time and cost associated with the use of a PCAOB-
    registered firm and the preparation of the internal control report;

- adds a degree of separation between the investment advisor and client assets desired by regulators *as an added layer of investment protection* [. . .]"[1] (*italics added*).

32.    On its website, Defendant represented to the public that its "experienced and well-trained staff will ... provide an increased level of comfort to [investment advisers'] investors."[2] Defendant further represented to the public that its "reputation as a custodian is dependent upon how we manage the recordkeeping and safekeeping of client assets and information."[3]

33.    Defendant assured prospective investors and others that using Defendant's custodial services "protect[s] account assets and funds against fraud."[4]

34.    Defendant further indicated that it "works closely with fund managers to understand the nuances of the fund [and] its underlying investments,"[5] and that it "provides the following custodial services for private funds:

- monitor, maintain and/or dispose of custodial assets as directed by the client;

- keep timely and accurate records of deposits, disbursements, investments, reinvestments, and other applications of custodial assets;

---

[1] Kingdom Trust, Institutional Custody, available at https://www.kingdomtrust.com/institutional-custody (last visited April 14, 2020).
[2] *Id.*
[3] *Id.*
[4] Kingdom Trust, the Duties of a Custodian, available at https://www.kingdomtrust.com/blog-duties-custodian (last visited April 19, 2020).
[5] Kingdom Trust, Fund Custody, available at https://www.kingdomtrust.com/institutional-custody/fund-custody (last visited April 13, 2020).

- prepare, maintain, and deliver statements to the fund and its underlying investors; and

- cooperate with fund auditors as required to verify assets owned by the fund and held by Kingdom Trust."[6]

35.     Defendant further represented to prospective investors and others that it "implement[s] and follow[s] such programs as Anti-Money Laundering (AML), Bank Secrecy Act (BSA), the US PATRIOT Act and Office of Foreign Asset Control (OFAC) regulations, among others."[7]

36.     Defendant assured prospective investors and others that it "has drafted a comprehensive Anti-Money Laundering Policy that, among other things, established the policy and procedures the company must employ to ensure compliance with the Patriot Act and other relevant legislation." Defendant represented to prospective investors and others that it "has a formal, documented and comprehensive information security program including … [an] anti-fraud program [and a] money laundering reporting program." Defendant further represented to the public that it has extensive and comprehensive account monitoring systems for client accounts, and specifically that it "collects account activity information such as deposit and transaction histories and information about investment histories gathered from client transactions and experiences with the custodian and transactions done in his or her account with third parties."[8]

37.     Lastly, Defendant represented to the public that, as a qualified custodian, it "must comply with BSA/AML, OFAC, CIP and Patriot Act rules and

---

[6] *Id.*

[7] Kingdom Trust, the Duties of a Custodian, available at https://www.kingdomtrust.com/blog-duties-custodian (last visited April 19, 2020).

[8] Kingdom   Trust,   Executive   Summary,   available   at https://www.kingdomtrust.com/qualified-custodian/executive-summary (last visited April 19, 2020).

requirements" and that it "qualifies as a bank under Internal Revenue Service guidelines."[9]

## C.    Relevant Non-Parties

### 1.    William Michael Jordan

38.    William Jordan, a resident of San Juan Capistrano, California, owned two Orange County investment companies: William Jordan Investments, Inc. and WJA Asset Management, LLC. Jordan was the president of William Jordan Investments, Inc., and the principal of WJA Asset Management, LLC.

39.    Jordan was the principal, organizer, and perpetrator of the Jordan Scheme.

40.    Jordan advertised himself as a financial advisor, and personally recruited investors to his Scheme. He did so after offering to advise them regarding their savings and entering into advisory, fiduciary relationships with them. Jordan was a registered investment advisor ("RIA") and a fiduciary of his investors.

41.    From 1998 through to 2010, Jordan worked as a licensed stockbroker for five different registered broker-dealers.

42.    From 2008 through August 2017, Jordan was also a registered investment advisor and the principal of his own investment advisory firm, William Jordan Investments, Inc.

43.    In August 2010, Jordan was terminated by the broker-dealer firm that employed him – the euphemism was "permitted to resign" – for engaging in selling away, the practice of unlawfully selling investments that were not authorized by his employer firm. However, Jordan continued to run his investment

---

[9] Kingdom Trust, *6 Differences Between Custodians and Administrators*, available at https://www.kingdomtrust.com/blog-custodians-administrators (last visited April 19, 2020). BSA/AML = Bank Secrecy Act / Anti-Money Laundering; OFAC = Office of Foreign Asset Control; CIP = Customer Identification Program.

advisory business, advise investors regarding their investments, in a fiduciary capacity as an RIA, and recruit those investors to invest in his Scheme.

44.    In July 2012, Jordan was fined $21,300 by the Financial Industry Regulatory Authority ("FINRA") and temporarily suspended for selling fraudulent bonds to his customers without conducting due diligence, having a reasonable basis to recommend those bonds, or notifying his employer in advance of those sales.

45.    In August 2017, Jordan was permanently barred from the securities and commodities industries by the California regulators for failing to report millions of dollars in losses to clients for years, commingling investor funds, and fraudulently selling unregistered securities.

46.    On May 15, 2018, the SEC filed a Complaint against Jordan alleging securities fraud.[10]

47.    On May 15, 2018, Jordan consented to an entry of Judgment, and on June 7, 2018, the court in the SEC Case entered judgment against him.[11] The Judgment ordered Jordan to pay disgorgement of ill-gotten gains, prejudgment interest, and a civil penalty, to be determined by the Court pursuant to a motion by the Commission.

48.    However, no such motion was filed in that case by the Commission following the June 7, 2018 Judgment, strongly suggesting that the Commission believed Jordan lacked the financial resources to make it worthwhile for the Commission to expend further resources in an effort to collect money from him.

---

[10] *SEC v. Jordan*, Complaint, Doc. 1, Case No. 8:18-cv-00852 (C.D. Cal. May 15, 2018). The documents filed with the Court in the SEC case are incorporated by reference herein.
[11]    *SEC v. Jordan*, Consent of Defendant William M. Jordan, Doc. 5 (May 15, 2018), and Judgment, Doc. 13 (June 7, 2018).

49.    Additionally, Plaintiff – and upon information and belief, the putative class members – never received any disgorgement payment from Jordan pursuant to the Judgment obtained by the Commission in its case against Jordan.

50.    Thus, it would be futile and a waste of judicial resources to name Jordan as a co-defendant in this case.

**2.    William Jordan Investments**

51.    William Jordan Investments, Inc. ("WJ Investments") is a California corporation formed by Jordan in or about 2007, with its principal place of business in Laguna Hills, California. From 2007 through August 2017, WJ Investments was a California-registered investment adviser controlled by Jordan.

52.    WJ Investments, along with Jordan personally, ostensibly acted as investment advisers and fiduciaries for the investors in the WJA Funds, the investment funds through which Jordan perpetrated his fraud.

**3.    WJA Asset Management, LLC**

53.    WJA Asset Management, LLC ("WJA Management") is a California limited liability company formed by Jordan in or about 2011, with its principal place of business in Laguna Hills, California. Jordan was WJA Management's control person.

54.    WJA Management ostensibly acted as the manager for the WJA Funds, through which Jordan perpetrated his Scheme.

55.    The WJA Funds were WJA Management's sole clients.

**4.    TD REO Fund, LLC**

56.    TD REO Fund, LLC ("TD REO Fund") is a California limited liability company formed by Jordan in or about 2013 as a foreclosure management fund, to manage the defaulted trust deeds held in Jordan's private investment funds.

57.    At all relevant times, TD REO Fund was controlled by Jordan.

**5.    The WJA Funds**

58.    The WJA Funds means and includes 16 private investment funds through which Jordan raised money from his advisory clients:

- 5827 Winland Hills Drive Development Fund, LLC
- Alabama Housing Fund, LLC
- CA Express Fund, LLC
- CA See Jane Go Fund, LLC
- CA Whirl Fund, LLC
- Equity Indexed Managed Fund, LLC
- PMB Managed Fund, LLC
- Prosper Managed Fund, LLC
- TD Opportunity Fund, LLC
- Urban Produce Fund, LLC
- Whirl Fund, LLC
- WJA Express Fund, LLC
- WJA Real Estate Opportunity Fund I, LLC
- WJA Real Estate Opportunity Fund II, LLC
- WJA Secure Real Estate Fund, LLC
- WJA Secure Income Fund, LLC.

59.    All WJA Funds were organized as California limited liability companies, and founded by Jordan between 2010 and 2016.

60.    In addition, Jordan raised money from investors in thirteen other limited liability companies.

61.    Jordan controlled each and every WJA Fund and other limited liability company through which he raised money from investors.

62.    Twenty-four of Jordan's funds and limited liability companies, including WJ Investments, WJA Management, and TD REO Fund filed for bankruptcy. The bankruptcy cases are still pending, making it impossible for the

WJA Funds and other limited liability companies involved in the Jordan Scheme to be named as co-defendants in this case.

63.    Jordan, WJ Investments, WJA Management, and the WJA Funds are sometimes referred to herein as the "Jordan Scheme Perpetrators."

## IV.    FACTS

### A.    Background on the Jordan Scheme

#### a. Jordan Organizes Several Fund Offerings, Raises $71 Million from Investors.

64.    Starting in or around 2010, Jordan began organizing the WJA Funds, which he controlled at all times thereafter.

65.    Starting in 2011 and continuing through 2016, Jordan raised more than $71 million from investors nationwide, through securities offering organized by WJA Funds in the form of private placements.

66.    The WJA Funds were managed by WJA Management, primarily through Jordan's financial advisory business WJ Investments, Inc.

67.    Jordan solicited funding for the WJA Funds privately through client referrals and by holding public investment seminars where prospective investors were encouraged to open an account with WJ Investments and purchase WJA Fund securities to capitalize on Jordan's investing expertise.

68.    Jordan offered and sold the WJA Funds' securities (the "Jordan Scheme Securities") to investors using private placement memoranda ("PPMs") as well as subscription agreements and operating agreements (collectively, the "Offering Documents").

#### b. Jordan Controlled the WJA Funds, Was His Investors' Advisor and Fiduciary, and Held Discretionary Powers Over His Investors' Money.

69.     Jordan, directly and/or through his corporate vehicles, controlled the entire Jordan Scheme – from the investment advisory business to the WJA Funds.

70.     Jordan ran the investment advisory companies that managed the WJA Funds, as well as the WJA Fund operations. He supervised the advisory business and WJA Funds' employees. He also directed and made the decisions as to the WJA Funds' investments. He had full control and discretionary powers over the operations and investments of the WJA Funds.

71.     Jordan acted as the investment advisor of prospective and existing WJA Fund investors. He personally spoke with his advisory clients, explained prospective and actual investments, and offered investment advice.

72.     Jordan grew his WJA Fund business by obtaining new advisory clients from education seminars that he conducted and from client referrals.

73.     Jordan's investors fully relied, and had to rely, upon his skill, expertise, and knowledge to invest their money, and entrusted him with their money to be invested according to each of the WJA Fund's "use of proceeds" provisions.

74.     Jordan fully controlled all of the WJA Funds' custodial accounts located at Kingdom Trust, and was the sole signatory on those accounts.

75.     Jordan was a fiduciary of his WJA Fund investors and, in his activities related to his management of their money, including his activities related to the custodial accounts located at Kingdom Trust, he was bound by his fiduciary duties to the WJA Fund investors.

   c.  **Jordan Induced His Investors to Invest in the WJA Funds Through Material Misrepresentations and Omissions in the Funds' Offering Documents, Including Information Regarding the Role of the WJA Funds' Trustee/Custodian, Defendant.**

76.     The Offering Documents prepared by Jordan for the WJA Funds and distributed to investors by Jordan to induce them to invest in the WJA Funds contained material misrepresentations and omissions, as more fully detailed below.

77.     Among others, the WJA Funds Offering Documents grossly overstated the expertise of those involved in managing the investors' money, including Jordan, misrepresented Jordan's professional background, disclosed only a fraction of fees levied on investors, wholly mischaracterized the use of the investors' funds and how Defendant would maintain and supposedly safeguard the investors' funds.

78.     Further, the WJA Fund Offering Documents indicated that the investors' money deposited in each WJA Fund would be invested as to that Fund's "use of proceeds" provisions and was to be kept separate and distinct from any other fund's account.

79.     The WJA Fund Offering Documents failed to disclose that the investors' money was going to be commingled, treated as one pool of money, misappropriated, and used for Ponzi payments, in violation of the WJA Funds' "use of proceeds" provisions and Jordan's fiduciary duties to his investors.

80.     Jordan attempted to create the impression that having third-party custodians for the WJA Funds' accounts enhanced investors' safety.

81.     In order to induce investors to invest, Jordan assured them he could not use the WJA Funds as a Ponzi scheme since he had set up (ostensibly) separate custody accounts for each of the Funds, primarily with Defendant Kingdom Trust.

82.     For that same purpose – to convince investors that their money was safe in the custody of a third-party – Jordan told investors that Defendant Kingdom Trust was the custodian for their money.

83.     Indeed, as Defendant Kingdom Trust knew, the investors were required to pay, and paid, custodial fees to Defendant, for its services as custodian of their money.

84.     In an email to Defendant in or about April 2012 about opening custodial accounts, Jordan said, "I'll be much happier when the assets are not under my direct control because it will give me a simple answer to the 'bernard madoff question' which of course every client asks."

85.     Jordan made such misrepresentations and omissions with the intent that his investors would rely upon them, and also rely upon Defendant's role as a custodian, to invest in the WJA Funds.

86.     Class members relied on those misrepresentations and omissions, and Defendant's role as a custodian of the WJA Funds, and thereby invested substantial amounts of money in the WJA Funds.

87.     Jordan assured his investors that their funds would be protected from comingling, and that they would be kept separate.

88.     Jordan also assured his investors that Defendant Kingdom Trust similarly would keep their funds in custody and would provide enhanced safety in its role as custodian.

89.     However, Kingdom Trust, as well as Jordan, failed to comply with their respective duties to safeguard the money, and keep it segregated and not commingle it, and thus caused substantial losses to Plaintiff and members of the class.

90.     In or about May 2015, Mr. McNally made his initial investment in the WJA Funds in reliance upon Jordan's misrepresentations and omissions, and the role of the Defendant as a custodian. Mr. McNally invested a total of $450,000.00, and, like all other class members, suffered substantial losses caused by Jordan and Kingdom Trust's wrongdoing.

**d.  Jordan Misused, Stole the Investors' Money.**

McNALLY v. KINGDOM TRUST COMPANY- CLASS ACTION COMPLAINT
-17-

91.     From 2011 through 2016, Jordan raised more than $71 million from the sale of Jordan Scheme securities to approximately 100 investors through misrepresentations and omissions in the WJA Funds' Offering Documents.

92.     The WJA Funds' Offering Documents misrepresented that the WJA Fund investors' money would not be commingled, and failed to disclose that they would be misused and improperly transferred to other WJA Funds and businesses controlled by Jordan and used to prop us such entities, in Ponzi scheme fashion.

93.     As Defendant knew, Jordan, who was a fiduciary of the WJA Funds' investors, personally controlled the WJA Funds through the use of Defendant's trust/custodial accounts. He controlled all of the bank accounts and trust/custodial accounts, including Kingdom Trust accounts, for the WJA Funds and was the sole signatory on the accounts.

94.     Jordan, with the assistance, cooperation, and permission of Kingdom Trust, comingled WJA Funds, operated them as one pool of money, and regularly – and improperly –transferred money between various WJA Funds and entities he controlled to meet cash flow needs.

95.     Not only did Defendant Kingdom Trust know that Jordan was comingling the investors' money in the WJA Funds, misappropriating it, and misusing it for Ponzi-like payments, it assisted, enabled, and allowed it to happen, in violation of its duties.

**e. The Jordan Scheme Collapsed.**

96.     On May 15, 2018, the SEC filed its Complaint against Jordan alleging three counts: fraud in the offer or sale of securities under Section 17(a) of the Securities Act, fraud in connection with the purchase or sale of securities under Section 10(b) of the Exchange Act and Rule 10b-5, and fraud by an investment adviser under Sections 206(1) and 206(2) of the Advisers Act.

97.     The Complaint, in sum, alleged that despite contracting with custodial institutions and promising to keep funds in separate accounts, Jordan

fraudulently managed investors' funds by commingling the funds, improperly transferring them and misappropriating them, and using them to perpetrate a Ponzi-like scheme.

98.   In its Complaint, the SEC stated that Jordan represented to investors that their "money would be used for certain disclosed purposes; that his compensation would be limited to particular amounts; and that the WJA Funds were … custodied by third parties,"[12]

99.   The SEC Complaint continued:

> Jordan, who had complete control of the WJA Funds' finances, commingled investor money; concealed the WJA Funds' true performance; engaged in pervasive, conflicted, and undisclosed inter-fund transfers; overpaid himself and his entities; … giving the false appearance of a successful business enterprise, when in fact investor money was being shared amongst the WJA Funds.[13]

100.   The Commission found that "Jordan personally controlled the WJA Funds" and "all of the … custodial accounts for the WJA Funds and was the sole signatory on their accounts."[14]

101.   As to the improper commingling by Jordan – which occurred in the accounts held, overseen, and managed by Defendant – the Commission stated:

> 31. Jordan commingled the WJA Funds, operating them as one pool of money, and regularly moving money between various WJA

---

[12] Complaint ¶ 4, Doc. 1, *Securities and Exchange Commission v. Jordan et al.*, Case No. 1:18-cv-00852 (C.D. Cal. May 15, 2018).
[13] *Id.*
[14] *Id.* at ¶ 29.

Funds to meet cash flow needs. Jordan documented such transfers as loans to, or investments in, the other WJA Funds.

\* \* \*

33. These money transfers allowed certain WJA Funds that were low on cash to continue in operation and to distribute cash to investors in which new investor money was paid to existing investors. The money transfers also perpetrated the fraudulent notion that the WJA Funds were part of an enterprise with significant liquidity, when, in fact, they were not.[15]

102.   The Commission stated that "Jordan also attempted to create the impression that having third party custodians for the WJA Funds' accounts enhanced investors' safety" and quoted Jordan's email about opening custodial accounts for some of the WJA Funds, where he said, "I'll be much happier when the assets are not under my direct control because it will give me a simple answer to the 'bernard madoff question' which of course every client asks." The Commission, however, added that "[a]lthough Jordan did set up custodial accounts for the WJA Funds, he retained complete control over the accounts."[16]

103.   The Commission stated that "Jordan did not disclose that investor proceeds would be commingled amongst different WJA Funds or that there would be pervasive inter-fund transfer activity," and indicated that "[i]nvestors would have found it important to their investment decisions to know that investor

---

[15] *Id.* at ¶¶ 31-33.
[16] *Id.* at ¶¶ 35-37.

proceeds were not used as disclosed and were commingled amongst the WJA Funds."[17]

104.    In a section entitled "Summary of Scheme to Defraud," the Commission stated:

102. Jordan created the impression that a third-party custodian controlled the WJA Funds' accounts, when instead he had complete control over the accounts and directed disbursements for fund investments, expenses, and fees and bonuses to WJA Management.

103. Jordan directed money transfers between WJA Funds, which allowed funds low on cash to distribute cash to investors.

* * *

105. Jordan transferred new investor money from one fund to another to pay his unearned bonuses.

106. Jordan directed material transactions between the WJA Funds which created conflicts of interest that he never disclosed to his advisory clients.

107. This scheme created the impression that Jordan's business enterprise was financially very successful. This false impression was central to Jordan's scheme because many of his advisory

---

[17] *Id.* at ¶¶ 46-48.

clients made new investments with him based on the perceived success of their earlier investments.[18]

The Commission concluded that Jordan engaged in material misrepresentations and a scheme to defraud, and improperly commingled and transferred investor money for Ponzi-like payments, to give investors the false appearance of a profitable business conceal from them that in reality the Jordan Scheme was not profitable and ultimately went bankrupt.[19]

105.    On June 7, 2018, Judge David O. Carter of the United States District Court for the Central District of California, entered judgment as to Jordan, following his consent to the entry of a judgment. The Court permanently restrained and enjoined Jordan from violating the securities laws and regulations and ordered him to pay disgorgement, prejudgment interest, and a civil penalty. See Judgment, attached hereto as Exhibit "C." Jordan neither admitted nor denied the SEC's allegations.

106.    The money transfers identified by the SEC facilitated, assisted, and enabled by Defendant also perpetrated the fraudulent notion that the WJA Funds were part of an enterprise with significant liquidity, when, in fact, they were not.

107.    Jordan also attempted to create the impression that having third party custodians, like Defendant, for the WJA Funds would enhance investors' safety, when in fact, Defendant assisted Jordan in accomplishing the opposite and assisted in his fraudulent activity by permitting him to comingle investor money in breach of the explicit contractual duty to keep accounts separate, as outlined in the Custodial Services Agreement, and allowed him to misuse such money.

---

[18] *Id*. at ¶¶ 102-103 and 105-107.
[19] *Id*. at ¶¶ 110, 115, 120.

108.   Jordan treated the WJA Funds as one pool of money, held by Defendant, with its main investment in trust deeds, either directly or indirectly through loans/investments into other WJA Funds investing in trust deeds.

109.   Investors would have found it important to their investment decision to know that:

    a.   investor proceeds were not used as disclosed, but in fact were comingled among the WJA Funds, misappropriated, and misused for Ponzi-like payments;

    b.   Defendant, to whom they were paying fees, allowed, assisted, and enabled Jordan to comingle funds in order perpetrate his scheme;

    c.   Jordan, with Defendant's assistance, directed conflicted and improper inter-fund transfers between WJA Funds;

    d.   Jordan, with Defendant's assistance, defrauded the investors and the WJA Funds by engaging in commingling, misuse of funds, and conflicted transactions without consent of the WJA Funds.

110.   Jordan breached his fiduciary duty owed to, and defrauded, his advisory client investors by commingling investor funds and entering into conflicted inter-fund transfers without disclosing the conflicts and obtaining investor consent.

111.   Jordan could not have perpetrated his fraud without the crucial enabling and assistance of Kingdom Trust.

**B. Defendant Kingdom Trust's Role and Participation in the Jordan Scheme.**

112.   Defendant Kingdom Trust played a crucial – and knowing – role in assisting and enabling the Jordan Scheme. It offered Jordan the essential infrastructure through which he was able to perpetrate his fraud.

113.   Throughout this relationship, and as more fully described below, Defendant learned that Jordan was raising money from investors and was

defrauding them and breaching his own fiduciary duties to them by misusing and misappropriating that money. Yet, armed with such knowledge, Defendant continued to assist Jordan perpetrate his scheme and victimize his investors – and the known beneficiaries of Defendant's trust and custodial services, to whom Defendant owed its own, independent duties.

114.   Defendant went to great extents to assist Jordan, in a substantial departure from the typical activities of a trustee/custodian, and violated its own contractual obligations and standard of conduct as a trustee/custodian to help Jordan perpetrate his scheme, in breach of its own duties to the WJA Fund investors.

115.   Defendant's infrastructure enabled Jordan to obtain money from his victims, improperly commingle such money, mis-direct it to other WJA Funds, misappropriate it, and misuse it for Ponzi-like payments, among other unauthorized uses.

116.   Defendant had a close and extensive relationship with Jordan and his Funds: between 2011 and 2016, Defendant held no less than 22 accounts for WJA Funds – by far the vast majority of WJA Fund accounts.

117.   During that multi-year period, Defendant had to prepare a vast number of periodic reports for each of the 22 or more WJA Funds and distribute those reports to the WJA Fund investors, who were beneficiaries of Defendant's custody and trusteeship of the WJA Fund accounts.

118.   In the process of preparing the vast number of periodic reports for the WJA Fund investors, Defendant reviewed and had to review in detail the transactions in each of the custodial/trust accounts it maintained for the WJA Funds, analyze them, and prepare reports based on those transactions.

119.   In the process of preparing the substantial number of periodic reports for the WJA Fund investors, Defendant also reviewed and had to review the assets and money in each of the custodial/trust account it maintained for the WJA Funds,

obtain valuations for those assets, compile those valuations, and prepare reports based on those valuations.

120.   As it conducted its reviews and prepared its reports, Defendant interacted extensively with the WJA Funds, Jordan, and his organization, and became closely familiar with the nature and extent of the Jordan Scheme, including the fact that Jordan was perpetrating a fraud and breaching his fiduciary duties to his investors.

### a. Regulatory Framework Applicable to Defendant's Conduct.

121.   At all relevant times, Defendant was a qualified custodian under the Investment Advisers Act of 1940, regulated by the SEC.

122.   Defendant was also a public trust company, regulated the South Dakota Division of Banking.

123.   Lastly, under the applicable federal laws and regulations implementing the Bank Secrecy Act, Defendant was, at all relevant times, deemed to be a financial institution and a bank, subject to certain federal anti-money laundering provisions and rules.

124.   As a public trust company and custodian of trust accounts, under the applicable South Dakota rules and regulations, Defendant was bound to act in the highest good faith toward the beneficiaries of the trust accounts its maintained and oversaw, and failure to do so amounted to fraud against such beneficiaries.

125.   The South Dakota Division of Banking has advised Defendant and other South Dakota-regulated trust companies that they must adopt the Statement of Principles of Trust Management (the "Statement"), and indicated the boards of Defendant and other trust companies should document a thorough review of the Statement annually to ensure ongoing compliance.

126.   The South Dakota Division of Banking suggests that the required Statement include an indication that the trust company's Board has appointed a

supervisory committee to supervise the trust company's activities, and that the committee should "[p]rovide for comprehensive oversight of the account opening and account closing processes, as well as the oversight of all purchases, sales, and/or changes in account assets utilizing predefined asset review factors."[20]

127.   The South Dakota regulators indicated that the goal of an "effective asset oversight program" of trust companies such as Defendant "is generally an extension of the internal account review process and can help mitigate risks associated with prohibited transactions and fraudulent activity."[21] The South Dakota regulators indicated that trust companies such as Defendant should review their accounts to identify suspicious activities and that:

> Management should assign risk levels or risk ratings to the different account, asset, and transaction types based on the risk levels. Those in the higher risk categories should be 'flagged' and subject to escalated review procedures, with a focus on potential prohibited transactions and fraudulent activity.[22]

128.   Under the applicable federal laws and regulations, trustees/custodians and banks such as Defendant are required to know their customers and understand their activities and conduct. Such duties are heightened as to customers that are deemed higher-risk, including customers that, like the WJA Management/WJA Funds and Jordan:

>    a.  Engage in the management of other people's investments (asset management);

---

[20]  South Dakota Division of Banking, Statement of Principles of Trust Management – Custodial, available at https://dlr.sd.gov/banking/trusts/documents/statement_of_principles_of_trust_management_custodial.pdf (last visited April 21, 2020).
[21] *Id.*
[22] *Id.*

b. Employ special use or concentration accounts such as trust or custody accounts intended to facilitate transactions by multiple parties within the same account; or

c. Offer investment products.

129. Pursuant to applicable regulations, a trustee/custodian/bank such as Defendant is required to collect and maintain information concerning its customers. The trustee/custodian/bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. § 1020.220(a)(2).

130. To discharge its duties, a trustee/custodian/bank such as Defendant is required to collect information about the holder of each account. *Id*. When a corporate entity rather than an individual opens an account, the bank must obtain information about the individuals with authority or control over the account. 31 C.F.R. § 1020.220(a)(2)(ii)(C).

131. Pursuant to the applicable AML rules and regulations, financial institutions including trust companies such as Defendant must monitor their accounts and report to federal banking regulators certain transactions that the financial institution knows, suspects, or has reason to suspect that:

- involve[] funds derived from illegal activities or [are] intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation, or, among others,

-    ha[ve] no business or apparent lawful purpose or [are] not the sort in which the particular customer would normally be expected to engage, and the financial institution knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction.

132.    Pursuant to its duties under the South Dakota and federal law, Defendant had an opportunity to review, and reviewed WJA Management and the WJA Funds and their accounts, and learned that:

a.  The WJA Funds were all investment programs that raised money from investors and pooled investor money;

b.  The WJA Funds received and held in their accounts with Defendant investment proceeds from investors;

c.  WJA Management and Jordan were managing investor money as fiduciaries of the investors;

d.  The WJA Fund trust/custodial accounts maintained by Defendant accounts held fiduciary funds;

e.  WJA Management and Jordan were misusing investor funds from the WJA Fund accounts, by commingling such funds and also by transferring them to Jordan and other entities whose business was unrelated to the WJA Funds' business;

f.  WJA Management and Jordan were misusing investor money for Ponzi payments;

g.  The WJA Funds and the WJA Scheme were primarily a Ponzi scheme, not a real business.

**b. Defendant Knew That It Received Investor, Fiduciary Funds into the WJA Funds' Trust/Custodial Accounts, and That Money from Those Accounts Was Commingled, Misused, and**

**Misappropriated by Jordan in Ponzi Fashion, with Defendant's Assistance.**

**(i)     Defendant Kingdom Trust Opened and Maintained WJA Fund Trust/Custodial Accounts Fully Aware That They Contained Investor Funds and That Jordan Was Acting as a Fiduciary.**

133.   Starting in or about 2014, Defendant Kingdom Trust opened trust/custodial accounts for the WJA Funds, at Jordan's request.

134.   Each WJA Fund trust/custodial account at Kingdom Trust was opened subsequent to the execution of a Custodial Services Agreement ("CSA") between Defendant and each such Fund. The CSAs included the contractual terms of the custody arrangement as well as Defendant's specific duties and responsibilities as trustee/custodian.

135.   Each CSA indicated that the WJA Fund was an investment fund and that it held investor money. Each CSA included a list with the names and contact information for each and every investor in the respective WJA Fund, identified as an "investor" in such Fund.

136.   Each CSA mandated Defendant to safeguard the respective WJA Fund investors' money, safe-keep it in separate accounts and not commingle it with any other Funds' money, and send those investors, on a regular basis, certain information about the respective WJA Fund, including a list of the then-current inventory of assets Defendant held for such Fund and any activity in the respective Fund's trust/custodial account held by Defendant during the statement period.

137.   The CSA stated that Defendant Kingdom Trust was a "qualified custodian" and that Defendant undertook an explicit, contractual duty to keep money in each WJA Fund in a "separate account."

138.  The CSAs further required Defendant to:

 a.  Safe-keep the assets in the custodial/trust accounts it maintained for each WJA Fund;

 b.  Segregate such assets from those of any other WJA Fund;

 c.  Monitor the transactions in the custodial/trust accounts it maintained for each WJA Fund;

 d.  Prepare and deliver to WJA Fund "investors" – identified as such – periodic, detailed statements regarding their investments held by Defendant in the WJA Funds' accounts;

139.  The CSA explicitly indicated that Defendant would not be indemnified or held harmless [by each respective WJA Fund] against claims arising out of Defendant's own negligence or willful misconduct.

140.  The CSA further indicated that Defendant had discretion on whether or not to follow Jordan's or each WJA Fund's instructions if such instructions might, in Defendant's reasonable opinion, cause Defendant to incur liability.

141.  The CSAs explicitly prohibited Defendant from commingling the assets in any WJA Fund trust/custody account with the assets of any other WJA Fund.

142.  Defendant received considerable fees for its trustee/custodian services provided to the investors in connection with the WJA Fund accounts it maintained and the periodic statements it prepared and sent to such investors, which fees were paid by the WJA Fund investors.

143.  Defendant, a public trust company and qualified custodian that advertised itself to the public as such, by: knowingly holding investor money in its trust/custodial accounts; preparing periodic reports about such investors' money and assets in those accounts and the transactions in those accounts for the benefit of the WJA Fund investors, and sending those reports to the WJA Fund

1   investors; and, receiving periodic fees from investors for those services, became
2   a fiduciary for the WJA Fund investors.

3   144.   Defendant became aware that funds flowing into the WJA Fund
4   trust/custodial accounts it opened and maintained were from WJA Fund investors.
5   Defendant also became aware of the purpose of the money coming into its
6   custodial/trust accounts, and that Jordan was acting as a fiduciary when managing
7   the WJA Funds' trust/custodial accounts.

8   145.   Thus, Defendant was aware that it received and held, in its
9   trust/custodial accounts for the WJA Funds, fiduciary money from Jordan
10  investors in the WJA Funds, as a result of:

    a.  Its extensive, multi-year relationship with Jordan, who opened at
        least 22 accounts for the WJA Funds with Defendant;

    b.  Its due diligence, mandated by the applicable banking regulations, as
        to Jordan, his corporate entities, and the WJA Funds when it opened
        trust/custodial accounts for each of those Funds to receive investor
        money in those accounts;

    c.  Its negotiation of trust/custodial account agreements with Jordan for
        each WJA Fund account, and its servicing of those accounts, which
        included preparing and sending periodic, detailed account statements
        to the WJA Fund investors, including Plaintiff;

    d.  Its monitoring of the trust/custodial accounts it maintained for the
        WJA Funds, pursuant to its obligations under the applicable banking
        regulations and the CSA it executed as to each Fund.

    **(ii)   Defendant Gained Actual Knowledge That It Assisted in,
            and Enabled, the Improper Commingling, Misuse, and
            Misappropriation of Investor Money in Ponzi Scheme
            Fashion.**

146. Defendant gained actual knowledge that Jordan was improperly commingling, mis-directing, misappropriating, and misusing in Ponzi scheme fashion investor fiduciary money deposited in each respective WJA Fund, thus defrauding, and breaching the fiduciary duties he owed to, the WJA Fund investors.

147. Defendant gained knowledge of such misconduct by virtue of: -

a. Its multi-year long, close relationship and extensive interactions with Jordan, the Jordan Scheme, and its Funds, which included opening and servicing at least 22 WJA Fund trust/custodial accounts and preparing a vast number of periodic reports for the benefit of the WJA Fund investors about the detailed transactions in each of those Funds' custodial/trust accounts and the assets and money they contained throughout that relationship;

b. The activities it performed in connection with its opening of at least 22 trust/custodial accounts for Jordan's fraudulent WJA Funds, including the negotiation and preparation of CSAs for each such account; the opening of appropriate accounts for each such Fund; its discharging its duties as a custodian/trustee under its internal policies and procedures and the applicable banking rules and regulations to identify the account holders and understand their business and activities;

c. Its monitoring of the WJA Fund trust/custodial accounts pursuant to its duties under the CSA, the applicable banking regulations, and its regular course of business with Jordan and his Funds, including for purposes of preparing those comprehensive, periodic reports for the benefit of the WJA Fund investors;

d. Its executing, and complying with, Jordan's improper instructions to commingle, mis-direct, misuse and misappropriate investor money,

1    in violation of its own CSA with each WJA Fund and its applicable

2    rules and regulations.

3        148.   Defendant knew that its role as custodian and trustee for the

4    investors' money in the WJA Funds gave prospective investors a false peace of

5    mind and impression of safety and legitimacy as to the WJA Funds, and was a

6    material – indeed, crucial – factor in their decision to invest with Jordan.

7    Defendant's knowledge of an investor's desire for an assurance of safety is

8    reflected in its own marketing, which trumpets the value and security it offers as

9    a third-party custodian.

10       **(iii)   Defendant Commingled Assets into a Single Pool, and**

11       **Helped Jordan Misuse and Misappropriate Investor**

12       **Money and Use It for Ponzi-Like Payments.**

13

14       149.   Defendant was duty-bound, pursuant to its contractual obligations

15   and its duties as a trustee and custodian of the WJA Fund accounts and a fiduciary

16   of the WJA Fund investors, to safeguard, keep separate, and not commingle the

17   assets it in each of its respective custodial/trust account for each WJA Fund.

18       150.   Defendant violated each of these duties, in a substantial departure

19   from the typical services provided by a trustee and custodian to such accounts,

20   with knowledge that by doing so it was assisting in Jordan's fraud and breach of

21   fiduciary duties perpetrated upon the WJA Fund investors, and in breach of

22   Defendant's own duties to those investors to safeguard their money.

23       151.   Instead of keeping separate the investor money in the custodial/trust

24   accounts for each WJA Fund, Defendant improperly and atypically commingled

25   such fiduciary money in a single pool in violation of its and Jordan's fiduciary

26   duties to the investors and the WJA Funds.

27       152.   Kingdom Trust agreed to give Jordan unfettered access to the pooled

28   assets and funds, allowing him to improperly shift money at his discretion,

misappropriate such money, prop up his failing businesses, and use such money to make Ponzi-like payments to existing investors.

153.   As a result of Defendant's knowing violation of its duties and assistance of Jordan and his Scheme, Jordan ran his Ponzi scheme using the pooled assets for years with Kingdom Trust's knowledge, permission, and crucial assistance.

154.   The structure and lax oversight of the pooled assets made them a breeding ground for Ponzi activity: one any bad actor could easily exploit. Because the funds were commingled in a single pool, and because Jordan was given such unfettered access by Defendant, payments were frequently made between funds in typical Ponzi fashion.

155.   Instead of keeping the investor funds held by Defendant separate and using those funds within the confines of each respective WJA Fund, Jordan – with Defendant's knowing assistance and permission – exploited his ability to access the pool of funds by making a series of unauthorized interfund transactions, withdrawing large sums for himself and his colleagues at will, and making Ponzi payments to shift new investor funds to meet cash flow demands for failing funds.

156.   Despite all these improper transactions, which on their face were fraudulent and a breach of fiduciary duty by Jordan, in addition to being a breach of Defendant's fiduciary and contractual duties, Defendant knowingly continued to comply with Jordan's improper instructions, cause the WJA Funds' trust/custodial accounts to be commingled in a single pool, and execute facially fraudulent transactions that misused and misappropriated investor money in Ponzi scheme fashion.

157.   Indeed, the SEC noted in its case against Jordan that he improperly commingled the investors' money in various WJA Funds, operated them as one pool of money, improperly paid himself, and regularly moved investor money

between various WJA Funds to meet cash flow needs, and that there was "pervasive" inter-fund transfer activity.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

158.   Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons or entities similarly situated, that invested in the Jordan Scheme and were damaged thereby (the "Class").

159.    The Proposed Class is defined as follows: All persons and entities that purchased or otherwise acquired the Offerings during the Class Period and suffered losses as a result.

160.   Excluded from the Class are (1) Defendant, (2) any person, firm, corporation, or other entity related to or affiliated with Defendant, or in which the Defendant has or had a controlling interest; (3) Williams M. Jordan, and any other employee or agent of William Jordan Investments, Inc., WJA Asset Management, LLC, or the WJA Funds; (4) members of the immediate family of Jordan; and (5) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

### NUMEROSITY

161.   The members of the Proposed Class are so numerous and geographically dispersed that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members remains unknown at this time, it is estimated that the Class includes approximately 100 investors who reside across the United States. The exact number investors in the Offerings is within the knowledge of the Defendant.

### COMMONALITY

162.   There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class including, *inter alia*:

a. Whether the Jordan Scheme perpetrators defrauded investors, misused investor money, and/or commingled investment proceeds from different investment programs;

b. Whether the Jordan Scheme and the WJA Funds were a Ponzi scheme;

c. Whether Defendant breached the duties it owed to Plaintiffs and the Class by failing to conform its conduct to the requirements of the law and applicable regulations;

d. Whether Defendant knew that the Jordan Scheme perpetrators were misusing and commingling investor money and/or using such money for Ponzi scheme payments;

e. Whether Defendant knowingly provided substantial assistance to the Jordan Scheme perpetrators;

f. Whether Defendant was negligent in its oversight of the WJA Fund accounts;

g. Whether Defendant improperly commingled WJA Fund investor money in violation of its duties;

h. Whether Defendant was a fiduciary of the WJA Fund investors;

i. Whether Defendant breached its fiduciary and other duties to the WJA Fund investors;

j. Whether Defendant's misconduct entitles Plaintiffs and members of the Class to damages for the loss of the amounts invested by Plaintiffs and members of the Class; and

k. What remedies are appropriate compensation for the damages caused to Plaintiff and each member of the Class.

## **TYPICALITY**

163.    Plaintiff's claims are typical of the claims of all Class members. His claims are based on the same fundamental factual allegations and legal theories

as the claims of all other members of the Class. Plaintiff is situated identically to all members of the Class with respect to the Offerings presented in this case, as Plaintiff and all members of the Class were investors in the Offerings and suffered the exact same loss (in proportion to the amount of their investment). Plaintiff's claims are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

## ADEQUACY

164.   Plaintiff will adequately represent and protect the interests of the Class and has no interests that conflict with or are antagonistic to the interests of the Class. Plaintiff has retained attorneys who are experienced in, and capable of prosecuting, complex class actions such as this case. The attorneys for Plaintiff and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof. The attorneys for Plaintiff have adequate resources, experience, and commitment to litigate this matter.

## PREDOMINANCE AND SUPERORITY

165.   A class action is superior to any other method available for the fair and efficient adjudication of this controversy because it would be impractical and undesirable for each of the individual Class members who have suffered damages to bring separate actions. There will be no difficulty in the management of this action as a class action. Moreover, the common issues identified above predominate over individual issues, if any, particular to each Class member.

## VI.   CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF CALIFORNIA CORPORATIONS CODE § 25504.1

166.   Plaintiff repeats and re-alleges each of the allegations set forth above.

167.   The Jordan Securities were "securities" within the meaning of Section 25019 of California's Corporate Securities Law of 1968.

168.   All of the Jordan Securities were "offered for sale" in the state of California pursuant to California Corporations Code § 25008 because the issuer of such securities was located in California and/or the offers for such notes originated in California, specifically from the Jordan Scheme's headquarters in Orange County, California.

169.   Pursuant to California Corporations Code § 25401, "[i]t is unlawful for any person to offer or sell a security in this state . . . by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

170.   California Corporations Code § 25501 provides that any person who violates § 25401 shall be liable to any other person who purchases a security from him.

171.   California Corporations Code § 25504.1 provides that any person who materially assists in a violation of § 25401 with intent to defraud is jointly and severally liable with the primary violator.

172.   As set forth above, the Jordan Securities were offered and sold by Jordan directly to Plaintiff and the members of the Class, through numerous untrue statements of material facts as well as omissions of material facts in the offering documents regarding the use of investment proceeds, transaction history, and financial condition of the WJA Funds.

173.   Such misrepresentations and omissions included the lack of compliance with each WJA Fund's stated use of proceeds; the failure to safeguard investor proceeds; the failure to keep such investor proceeds separate and not commingle them with other WJA Funds' proceeds; the improper commingling of the WJA Funds' investor money; the misappropriation and misuse of WJA Fund

investor money for improper payments to Jordan and his other, failing Funds, and for Ponzi-style payments to other WJA Fund investors.

174.   Such misrepresented and omitted facts were "material" within the meaning of California Corporations Code § 25401 because they were facts a reasonable investor would consider in deciding whether to invest.

175.   Indeed, the Securities and Exchange Commission also indicated that "Investors would have found it important to their investment decisions to know that investor proceeds were not used as disclosed and were commingled amongst the WJA Funds."[23]

176.   Thus, Jordan and the Jordan Scheme violated the provisions of California Corporations Code § 25401 and are liable to Plaintiff and the Class members.

177.   As demonstrated above, Defendant knew that Jordan and the Jordan Scheme were defrauding WJA Fund investors by commingling, misappropriating, and misusing investor money to pay Jordan and make Ponzi-like payments to other investors. Defendant knowingly and with intent to defraud assisted in Jordan's fraud by executing and assisting such facially fraudulent transactions.

178.   Defendant's assistance was not merely material; it was crucial in that Defendant –with knowledge, in violation of its own duties, in breach of contract, and in a substantial departure from the typical activities of a trustee/custodian – improperly commingled the investors' money in all WJA Funds in one pool of money and executed the facially improper transactions as per Jordan instructions, enabling Jordan to misuse and misappropriate the WJA Fund investors' money. Simply put, had Defendant followed its contractual obligations and duties, and had it not complied with Jordan's unlawful instructions to improperly transfer investor

---

[23] Complaint ¶ 48, Doc. 1, *Securities and Exchange Commission v. Jordan et al.*, Case No. 1:18-cv-00852 (C.D. Cal. May 15, 2018).

money, Jordan would have been unable to perpetrate his fraudulent Scheme through Defendant's trust/custodial accounts.

179.   Defendant is jointly and severally liable, along with Jordan and the Jordan Scheme, for Defendant's material assistance, with intent to defraud, of the Jordan Scheme's fraudulent Securities Offering, pursuant   to   California Corporations Code § 25504.1, because Defendant knowingly and materially aided in the acts or transactions constituting violations of § 25401 for the reasons set forth in the preceding paragraphs.

180.   Pursuant to California Corporations Code § 25501, Plaintiff and the members of the Class are entitled to rescission of their purchase of WJA Fund securities and recovery of the full amount of consideration paid for such notes as well as interest at the applicable legal rate, upon tender of their securities, which tender Plaintiff and the Class hereby make. Alternatively, Plaintiff and members of the Class are entitled to damages, measured as the difference between the price at which the WJA Fund securities were purchased and the value of such notes at the time such notes were disposed of.

## COUNT II

## AIDING AND ABETTING FRAUD

181.   Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

182.   As detailed above, the Jordan Scheme was fraudulent because, among other reasons, the Jordan Scheme Perpetrators made material misrepresentations and omissions and knowingly failed to disclose to its investors that: the Jordan Scheme was a Ponzi scheme and investor money was being used to make supposed distribution payments to other investors; the investor money was commingled across all programs; the Jordan Scheme perpetrators were misappropriating and misusing investor funds for their personal expenses.

183.   The Jordan Scheme perpetrators' business did not generate enough revenue to fund the investors' distributions and so they financed promised distributions with fresh investor funds, in Ponzi fashion. Jordan and his Scheme misused investors' funds, improperly commingled investor money, misappropriated it, and used it for Ponzi payments. In addition to making Ponzi payments to investors, the Jordan Scheme perpetrators also paid themselves handsomely—and improperly—with investor money.

184.   These misrepresentations and omissions were material—indeed essential—to the investors, who had no reason to believe that their money would not be used as intended and as represented.

185.   The Jordan Scheme perpetrators intended the investors to rely on such misrepresentations and omissions, and the investors did rely when investing.

186.   Investors were injured when their money was obtained through fraud, as more fully described above, by being directed to deposit their money into Kingdom Trust custodial/trust accounts, from which the parts of their investment proceeds were improperly withdrawn, where their proceeds were commingled across the various Jordan Scheme entities, and from which funds were withdrawn to make Ponzi scheme payments to other investors.

187.   Defendant knowingly provided substantial assistance to the Jordan Scheme's fraud by:

    a. receiving money from investors into each respective WJA Funds' Kingdom Trust custodial/trust accounts;

    b. improperly facilitating the commingling of the WJA Fund investors' funds across the custodial/trust accounts of the WJA Funds, which were treated as one pot of money, in breach of Defendant's own agreement with each of the WJA Funds and of its duties to investors and the WJA Funds;

c.  transferring Ponzi scheme payments amongst the WJA Funds' accounts and to investors which investors believed to be distributions owed on their investments, with knowledge that such money came from investment proceeds deposited by other investors; and

d.  improperly transferring investor money to Jordan.

188.  The transactions that Defendant executed, with knowledge of the violations, amongst the WJA Funds' accounts were atypical, both in nature and frequency, and were a substantial departure from the usual services provided by a public trust company like Defendant.

189.  Defendant received substantial compensation for such transactions, which incentivized it to turn a blind eye and continue to substantially assist the Jordan Scheme perpetrators.

190.  As more fully described above, Defendant acquired actual knowledge of the fraudulent Jordan Scheme because:

a.  Defendant conducted due diligence when it entered into its business relationship with the Jordan Scheme, Jordan, and each of the WJA Funds and thereafter throughout its business relationship, as required by its internal policies and procedures, as well as by applicable laws and regulations, and also while negotiating and preparing the CSAs and preparing to open custodial/trust accounts and provide custodial/trust to each of the WJA Funds' accounts;

b.  Defendant had a multi-year long, close relationship and extensive interactions with Jordan, the Jordan Scheme, and the WJA Funds, which included opening and servicing at least 22 WJA Fund trust/custodial accounts, receiving money from, and paying money to, WJA Fund investors;

c.  Defendant regularly and closely reviewed the WJA Funds' custodial/trust accounts, and the transactions therein by virtue of its

internal policies and procedures and the applicable banking laws, and also – crucially – on a regular basis while preparing a vast volume of periodic reports for the WJA Fund investors, detailing the transactions in each of those accounts and the amounts and values in the accounts. While doing so, Defendant learned the nature of the Jordan Scheme' business and operations, including transactions in those accounts, and understood that the WJA Funds were investment vehicles and were soliciting and receiving money from investors to be deposited in Defendant's custodial/trust accounts ostensibly to be managed by WJA Management and its principals as fiduciaries, and invested in WJA Funds;

d. Defendant also regularly reviewed the WJA Funds' accounts by virtue of manually processing a substantial number of transactions in those accounts, representing investor deposit of investment proceeds;

e. Through its frequent and extensive review of the WJA Funds' accounts, Defendant learned that the Jordan Scheme and Jordan were orchestrating Ponzi payments to existing investors, with money from new investors; were improperly commingling investor funds intended to be invested in different investment programs, were using some of that money for Ponzi payments; and were misusing and siphoning investor money to their personal accounts;

191. By virtue of its substantial and material assistance to Jordan and the Jordan Scheme, Defendant was aware of its role in the Jordan Scheme's fraudulent activity and it acted knowingly in assisting the fraud perpetrated by Jordan and the Jordan Scheme.

192. In addition, as a custodian/trustee for the WJA Funds and the investors' money, Defendant owed to Plaintiff and the Class members, as well as

the WJA Funds, a fiduciary duty with respect to Plaintiff's and Class members' fiduciary money deposited in its custodial/trust accounts under its oversight, and/or a duty to safeguard such money, keep it separate and not commingled, and avoid assisting in its misuse and/or misappropriation.

193.   Also in addition, pursuant to its CSA with the WJA Funds, Defendant owed a duty to the Plaintiff and the class members, as well as the WJA Funds, to safekeep the funds in its trust/custodial accounts, and prevent it from being commingled or misused.

194.   Defendant breached its independent duties outlined above by commingling such investor money and executing Jordan's facially unlawful instructions to misuse and misappropriate investor money and use it for Ponzi payments.

195.   Defendant's knowing misconduct was the proximate cause of Plaintiff's and Class members' losses, because it directly and proximately resulted in the commingling, misuse, and misappropriation of their investments. Indeed, Defendant commingled all funds in all the WJA Funds' accounts into one singular pot of money and therefore assisted in disbursing funds to investors as supposed distributions on their investments, despite knowing that the Jordan Scheme did not earn enough profit on the investment programs to finance those distributions, and that Ponzi payments were used instead. These were the final acts of the fraud process that caused the loss of Plaintiff's and Class members' money.

196.   As a direct and proximate consequence of Defendant's misconduct as described in the foregoing and throughout this Complaint, Plaintiff and members of the Class have lost a substantial portion of the money they invested in the Jordan Scheme, in an amount to be determined but well in excess of $5,000,000.

## COUNT III

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

197.    Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

198.    As set forth herein, the Jordan Scheme and Jordan owed fiduciary duties to Plaintiff and the other investors because the investors placed their trust and confidence in Jordan, their advisor, and the Jordan Scheme to manage the WJA Funds and invest their money appropriately, and had to entirely rely on the Jordan Scheme perpetrators to appropriately invest and manage their money and the properties ostensibly purchased with that money.

199.    Jordan and the Jordan Scheme perpetrators touted their superior knowledge, diligence, and expertise in managing WJA Funds. Investors relied on these representations, and entrusted their money to Jordan and the Jordan Scheme perpetrators because such investors believed that Jordan and the Jordan Scheme perpetrators would use their superior skill and expertise to manage the investments.

200.    Jordan and the Jordan Scheme perpetrators breached their fiduciary duties to the Plaintiff and Class members by, among others, defrauding them and by misusing, commingling, and converting their money, as more fully detailed above.

201.    Defendant knew that Jordan and the Jordan Scheme perpetrators were fiduciaries of the investors and that fiduciary, investor money was being deposited in its custodial/trust accounts for Jordan and the Jordan Scheme perpetrators to manage in a fiduciary capacity; was aware that Jordan and the Jordan Scheme perpetrators were breaching their fiduciary duties to the investors by (1) commingling investor money; (2) misusing and misappropriating investor money intended to be invested in various WJA Funds investment programs and instead improperly transferring such money to Jordan and the Jordan Scheme

perpetrators; (3) using new investor funds deposited in such accounts to make distributions to existing investors, in typical and obvious Ponzi scheme fashion; and (4) running a "shell" operation to cover up the Ponzi scheme, where in reality the income deposited into the WJA Funds' accounts from any underlying operations was far less than the amount of money being disbursed to investors as distribution payments.

202.   Defendant knowingly provided substantial assistance to Jordan and the Jordan Scheme perpetrators' breach of fiduciary duty to investors by facilitating the improper commingling, transfers, and misuse of investor money with knowledge that such money was fiduciary funds and its improper use and transfer was a breach of Jordan's and the Jordan Scheme perpetrators' fiduciary duties owed to the investors, and by otherwise knowingly accommodating the Jordan Scheme perpetrators and Jordan in the course of their breaches of fiduciary duties owed to the investors, including by:

   a. receiving money from investors into each respective WJA Funds' Kingdom Trust custodial/trust account with knowledge that such investor, fiduciary money was being commingled, misused, and misappropriated;

   b. improperly commingling the WJA Fund investors' money across the custodial/trust accounts of the WJA Funds, which were treated as one pot of money, in breach of Defendant's own agreement with each of the WJA Funds and of its duties to investors and the WJA Funds;

   c. divesting and misdirecting a significant portion of the investors' money to Jordan and the Jordan Scheme perpetrator's personal accounts; and

   d. Improperly transferring Ponzi scheme payments amongst the WJA Funds' accounts and to investors, which investors believed to be distributions owed on their investments, with knowledge that such money came from investment proceeds deposited by other investors.

203.   Such transactions as Defendant executed were highly atypical, both in nature and in frequency, and a substantial departure from the usual services provided by a public trust company like Defendant.

204.   Defendant received substantial compensation for such transactions and such compensation gave it the incentive to turn a blind eye and continue to assist Jordan and the Jordan Scheme perpetrators' in breach of its fiduciary duty.

205.   As more fully described above, Defendant acquired actual knowledge of the widespread breach of fiduciary duty by Jordan and the Jordan Scheme perpetrators year after year, because:

a.   Defendant conducted due diligence when it began its business relationship with the Jordan Scheme, Jordan, and each of the WJA Funds and thereafter throughout its business relationship with them, as required by Defendant's internal policies and procedures, as well as by applicable laws and regulations, and while also negotiating and preparing the CSAs and preparing to open custodial/trust accounts and provided custodial/trust to each of the WJA Funds' accounts;

b.   Defendant had a multi-year long, close relationship and extensive interaction history with Jordan, the Jordan Scheme, and the WJA Funds, which included opening and servicing at least 22 WJA Fund trust/custodial accounts, receiving money from, and paying money to, WJA Fund investors;

c.   Defendant   regularly and closely reviewed the WJA Funds' custodial/trust accounts and the transactions therein by virtue of its internal policies and procedures and the applicable banking laws, and also – crucially – on a regular basis while preparing a vast volume of periodic reports for the WJA Fund investors, detailing the transactions in each of those accounts and the amounts and values in the accounts. While doing so, Defendant learned of the nature of the Jordan Scheme's

business and operations, including transactions in those accounts, and understood that the WJA Funds were fiduciary investment vehicles and were soliciting and receiving money from investors to be deposited in Defendant's custodial/trust accounts ostensibly to be managed by Jordan and the Jordan Scheme perpetrators as fiduciaries, according to their use of proceeds;

d. Defendant also regularly reviewed the WJA Funds' accounts by virtue of manually processing a substantial number of payments in those accounts, representing investor deposit of investment proceeds;

e. Through its frequent and extensive review of the WJA Funds' accounts, Defendant learned that the Jordan Scheme and Jordan, who were fiduciaries of the investors, were orchestrating Ponzi payments to existing investors, with money from new investors; were improperly commingling investor funds intended to be invested in different investment programs, were using some of that money for Ponzi payments; and were misusing and siphoning investor money to their personal accounts, all in breach of their fiduciary duties;

206. By virtue of its substantial and material assistance to the Jordan Scheme, Defendant was aware of its role in Jordan's and the Jordan Scheme perpetrators' breach of fiduciary duty owed to investors and it acted knowingly in assisting such breach of fiduciary duty.

207. In addition, as a custodian/trustee for the WJA Funds and the investors' money, Defendant owed to Plaintiffs and the Class members, as well as the WJA Funds, a fiduciary duty with respect to Plaintiff's and Class members' fiduciary money deposited in its custodial/trust accounts under its oversight, and/or a duty to safeguard such money, keep it separate and not commingled, and avoid assisting in its misuse and/or misappropriation.

208.   Also in addition, pursuant to its CSA with the WJA Funds, Defendant owed a duty to the Plaintiff and the class members, as well as the WJA Funds, to safekeep the funds in its trust/custodial accounts, and prevent it from being commingled or misused.

209.   Defendant breached its duties outlined above, owed to Plaintiff and the Class members, by commingling such money and executing Jordan's facially unlawful instructions to misuse and misappropriate investor money and use it for Ponzi payments, in breach of his fiduciary duties.

210.   Defendant's knowing misconduct was the proximate cause of Plaintiff's and Class members' losses, because it directly and proximately resulted in the loss of their investments. Indeed, Defendant assisted in disbursing funds to investors as distributions on their investments, despite knowing that such funds came from other investors, Jordan and the Jordan Scheme perpetrators did not earn enough income on the investment programs to finance those distributions, and that Ponzi payments were used instead. Defendant's knowing facilitation and assistance of these breaches of fiduciary duty caused the loss of the Jordan investors' money.

211.   As a direct and proximate consequence of Defendant's misconduct as described in the foregoing and throughout this Complaint, Plaintiff and members of the Class have lost a substantial portion of the money they invested in the Jordan Scheme, in an amount to be determined at trial but well in excess of $5,000,000.

## COUNT IV
## CIVIL CONSPIRACY

212.   Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

213.   In its capacity as a trustee/custodian for investors' money, Defendant owed Plaintiff and Class members a duty to safeguard, segregate, and oversee

Plaintiff's and Class members' funds in accordance with Plaintiff's and Class members' expectations as investors in the WJA Funds, the CSA between Defendant and the WJA Funds, and Defendant's duties as a public trust company and trustee/custodian of the fiduciary WJA Fund accounts.

214.   Defendant also owed Plaintiff and Class members a duty of care because Kingdom Trust (a) knew that a fiduciary relationship existed between Jordan and the Jordan Scheme perpetrators, on one hand, and the investors, on the other hand; (b) knew that it held fiduciary funds in the WJA Funds' Kingdom Trust custodial/trust accounts; (c) knew and/or – in the alternative – was on notice that that investor funds were being misappropriated and/or were at risk of being misappropriated.

215.   Armed with the knowledge that the fraudulently comingled funds were being used to perpetrate the Jordan Scheme and were being misused and misappropriated, Defendant agreed to allow, assist, and enable Jordan to commit the underlying breach of fiduciary duty and failed to act when it had a duty to protect the funds from the very Scheme Defendant knew Jordan was perpetrating.

216.   Defendant itself commingled investor funds, misused and misappropriated those funds, and facilitated Ponzi payments in furtherance of the agreement between Defendant and Jordan to violate their obligations to Plaintiff and the Class members.

217.   Jordan and Defendant agreed to commit the Jordan Scheme by allowing the continuous breach of the duties Defendant and Jordan owed to the investors.

218.   Jordan and Kingdom Trust committed a wrongful act pursuant to their agreement by allowing the commingling of investor funds to aid Jordan in perpetrating his Scheme.

219.   Jordan and Defendant's acting in concert proximately caused substantial damages to the members of this Class. Plaintiff seeks to recover damages as a result thereof in an amount to be determined by a jury at trial.

## COUNT V

## NEGLIGENCE

220.   Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

221.   In its capacity as a trustee/custodian for the Jordan investors' fiduciary money, Defendant owed Plaintiff and Class members a duty to safeguard, keep separate, and oversee Plaintiff's and Class members' funds in accordance with Plaintiff's and Class members' expectations as investors in the WJA Funds.

222.   Defendant further owed a duty of care to Plaintiff and the class pursuant to the CSA it executed; its capacity of public trust company; the fact that it received fees from Plaintiff and the class for its custodial/trust services; and the fact that it prepared and distributed to investors periodic reports that purported to describe the transactions and the values of the assets in their accounts held by Defendant.

223.   Defendant also owed Plaintiff and Class members a duty of care because Defendant (a) knew that a fiduciary relationship existed between Jordan and the Jordan Scheme perpetrators, on one hand, and the investors, on the other hand; (b) knew that it held fiduciary funds in the WJA Funds' Kingdom Trust custodial/trust accounts; (c) knew and/or – in the alternative – was on notice that that investor funds were being misappropriated and/or were at risk of being misappropriated.

224.   Indeed as more fully described above, Defendant acquired such actual knowledge because:

a. Defendant conducted due diligence when it entered into its business relationship with the Jordan Scheme, Jordan, and each of the WJA Funds and thereafter throughout its business relationship, as required by the banks internal policies and procedures as well as by applicable laws and regulations, and also while negotiating and preparing the CSAs and preparing to open custodial/trust accounts and provide custodial/trust to each of the WJA Funds' accounts;

b. Defendant had a multi-year long, close relationship and extensive interactions with Jordan, the Jordan Scheme, and the WJA Funds, which included opening and servicing at least 22 WJA Fund trust/custodial accounts, receiving money from, and paying money to, WJA Fund investors;

c. Defendant regularly and closely reviewed the WJA Funds' custodial/trust accounts and the transactions therein by virtue of its internal policies and procedures and the applicable banking laws, and also – crucially – on a regular basis while preparing a vast volume of periodic reports for the WJA Fund investors, detailing the transactions in each of those accounts and the amounts and values in the accounts. While doing so, Defendant, learned the nature of the Jordan Schemes' business and operations, including transactions in those accounts, and understood that the WJA Funds were fiduciary investment vehicles and were soliciting and receiving money from investors to be deposited in Defendant's custodial/trust accounts ostensibly to be managed by WJA Management and its principals as fiduciaries, and invested according to their "use of proceeds";

d. Defendant also regularly reviewed the WJA Funds' accounts by virtue of manually processing a substantial number of transactions in those accounts, representing investor deposit of investment proceeds;

e.  Through its frequent and extensive review of the WJA Funds' accounts, Defendant learned that the Jordan Scheme and Jordan, who were fiduciaries of the investors, were orchestrating Ponzi payments to existing investors, with money from new investors; were improperly commingling investor funds intended to be invested in different investment programs, were using some of that money for Ponzi payments; and were misusing and siphoning investor money to their personal accounts, all in breach of their fiduciary duties.

225.  Defendant was negligent and breached its duties to Plaintiff and Class members who deposited their money into Kingdom Trust's custodial/trust accounts by:

a.  Receiving money from investors into each respective WJA Funds' Kingdom Trust custodial/trust accounts;

b.  Improperly commingling the WJA Fund investors' money across the custodial/trust accounts of the WJA Funds, which were treated as one pot of money, in breach of Kingdom Trust's own agreement with each of the WJA Funds and of its duties to investors and the WJA Funds;

c.  Transferring Ponzi scheme payments amongst the WJA Funds' accounts and to investors, which investors believed to be "distribution payments" owed on their investments, with knowledge that such money came from investment proceeds deposited by other investors; and

d.  Improperly transferring investor money to Jordan.

226.  Plaintiff and members of the Class who deposited funds into Defendant's dedicated WJA Funds' custodial/trust accounts were injured as a proximate result of Defendant's negligence and seek to recover damages as a result thereof in an amount to be determined at trial.

## COUNT VI

## BREACH OF FIDUCIARY DUTY

227.   Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

228.   Kingdom Trust owed to Plaintiff and the Class members a fiduciary duty with respect to Plaintiff's and Class members' fiduciary money deposited in its trust/custodial accounts under its oversight, and/or a duty to safeguard such money, keep it separate and not commingled, and avoid assisting in its misuse and/or misappropriation. Such duty arose out of Kingdom Trust's position of custodian/trustee for the WJA Funds and the investors' money, the fact that Kingdom Trust was and advertised itself to be a public trust company, its knowledge that it was holding fiduciary money belonging to investors in its trust/custodial accounts, its duty to safeguard such money, its regular reports to the investors regarding the status of their money, and its superior position of knowledge vis-à-vis the investors and ability to control the transactions involving the investor money in its trust/custodial accounts.

229.   Defendant breached its independent duties outlined above by commingling such money and executing Jordan's facially unlawful instructions to misuse and misappropriate investor money and use it for Ponzi payments.

230.   Defendant's knowing misconduct was the proximate cause of Plaintiff's and Class members' losses because it directly and proximately resulted in the commingling, misuse, and misappropriation of their investments. Defendant knowingly commingled all funds in all the WJA Funds' accounts into one singular pot of money and therefore assisted in disbursing funds to investors as supposed "distribution payments" on their investments, despite knowing that the Jordan Scheme perpetrators did not earn enough profit on the investment programs to finance those distribution payments, and that Ponzi payments were

used instead. These were the final acts of the process that caused the loss of Plaintiff's and Class members' money.

231.   As a direct and proximate consequence of Defendant's breach of its fiduciary duty as described in the foregoing and throughout this Complaint, Plaintiff and members of the Class have lost a substantial portion of the money they invested in the Jordan Scheme, in an amount to be determined but well in excess of $5,000,000.

## COUNT VII
## FRAUD

232.   Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

233.   In addition to aiding and abetting Jordan's fraudulent conduct by permitting Jordan to perpetrate his Scheme, Defendant committed its own fraud when it created and sent statements to the WJA Fund investors regarding the Funds' assets and funds in each account and the transactions in said accounts, but failed to disclose the commingling, misuse, and misappropriation of the investors' funds out of the same accounts.

234.   Defendant purposefully hid this material information regarding the commingling of funds because it knew that if it disclosed this information to the investors, they would have taken steps to terminate their relationship with Defendant and the WJA Funds or otherwise protect their investments from further misuse and misappropriation.

235.   Defendant also perpetrated the fraudulent notion that the WJA Funds were part of an enterprise with significant liquidity, when, in fact, they were not.

236.   Defendant's self-serving, fraudulent conduct allowed not only Jordan's Scheme to continue, but allowed Defendant to continue profiting from its relationship with the investors to the investors' detriment.

237.    Plaintiff justifiably relied on Defendant's fraudulent statements and conduct in keeping his money invested and under Defendant's custody. Defendant therefore continued to be paid money by Plaintiff and other WJA Fund investors who had their money custodied with Defendant.

238.    Defendant's fraudulent conduct directly and proximately caused Plaintiffs' substantial losses of the funds they invested in the Jordan Scheme, in an amount to be determined but well in excess of $5,000,000.

## COUNT VIII

## NEGLIGENT MISREPRESENTATIONS AND OMISSIONS

239.    Plaintiff repeats and re-alleges each of the allegations contained in the foregoing paragraphs as if fully set forth herein.

240.    Defendant in the very least negligently omitted material information and made misrepresentations about the misuse, commingling, and misappropriation of the funds in each of the Jordan accounts.

241.    Defendant had a duty to prevent the Funds from being commingled, and if said commingling occurred, had a duty to inform its customers, the investors, of the issue. Defendant breached its duty by failing to alert its customers to this issue, while sending them regular reports about their money and transactions in the WJA Fund accounts.

242.    Furthermore, Defendant also misrepresented to its customers that the WJA Funds were part of an enterprise with significant liquidity, when, in fact, they were not.

243.    Plaintiff justifiably relied on Defendant's fraudulent statements and conduct in keeping his money invested and under Defendant's custody. Defendant therefore continued to be paid money by Plaintiff and other WJA Fund investors who had their money custodied with Defendant.

244.   Defendant's negligent misrepresentations and omissions directly and proximately caused Plaintiffs' substantial losses of the funds they invested in the Jordan Scheme, in an amount to be determined but well in excess of $5,000,000.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the other members of the Class, prays for judgment as follows:

(a)      Determining that this action is a proper Class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members for all damages sustained as a result of Defendant's wrongdoing in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class members their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

Date: April 29, 2020

**Jonathan W. Evans & Associates**

*/s/ Michael S. Edmiston*
Michael S. Edmiston (CASBN 191874)
Jonathan W. Evans & Associates
12711 Ventura Boulevard, Suite 440
Studio City, California 91604-2456
Telephone: (818) 760-9880
Facsimile: (818) 760-9881
E-mail:  msedmiston@stocklaw.com

**Goldman Scarlato & Penny, PC**

Alan Rosca (OHBN 0084100)
(***Pro hac vice to be submitted***)23250
Chagrin Blvd. Suite 100
Beachwood, OH 44122
Telephone: (216) 570-0097
Facsimile: (484) 580-8747
E-mail: rosca@lawgsp.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Paul Scarlato (PABN 47155)
(*Pro hac vice to be submitted*)
23250 Chagrin Blvd. Suite 100
Beachwood, OH 44122
Telephone: (216) 570-0097
Facsimile: (484) 580-8747
E-mail: scarlato@lawgsp.com

Brendan P. McDonnell
(*Pro hac vice to be submitted*)
8 Tower Bridge, Suite 1025
161 Washington Street
Conshohocken, PA 19428
Telephone: (484) 342-0700
Facsimile: (484) 580-8747
E-mail: mcdonnell@lawgsp.com

**McCarthy, Lebit, Crystal & Liffman Co., LPA**

Hugh D. Berkson
(*Pro hac vice to be submitted*)
McCarthy, Lebit, Crystal &
Liffman, LPA
101 W. Prospect Ave, Suite 1800
Cleveland, OH 44115
Telephone (216) 696-1422
Facsimile: (216) 696-1210
E-mail: hdb@mccarthylebit.com